**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**　　　　　　　　　　　　**08-CR-211 A**

**ANTHONY AMHAD HOWARD,**

        **Defendant.**
_____


## REPORT, RECOMMENDATION AND ORDER

      This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.


## PRELIMINARY STATEMENT

      The defendant, Anthony Amhad Howard ("the defendant"), is charged in a multi-count indictment with having violated Title 21 U.S.C. § § 841(a)(1) and 841(b)(1)(A) (Count 1); Title 21 U.S.C. § 844(a) (Count 2); Title 21 U.S.C. §§ (a)(1) and 841(b)(1)( c ) (Count 3); and Title 21 U.S.C. § 844(a) (Count 4).  (Docket #1).


      The defendant filed a motion seeking suppression of the evidence seized as a result of an alleged illegal search of his person and his motor vehicle. (Docket #13).  Thereafter, an evidentiary hearing was held by this Court and a transcript of those proceedings was filed.  (Docket #s 24 and 26). Post-hearing memoranda were

filed by the defendant and the government.  (Docket #s 25 and 29, respectively).


## **FACTS**[1]

On July 27, 2007, a drug task force of the Niagara County Sheriff's Office ("NCSO") was conducting an investigation of an individual by the name of Anthony David Barone.  (T1 p. 27).  A search warrant for the residence of Barone located at 5976 Elmwood Lane, Lot Number 45, a house trailer located in a trailer park in Newfane, County of Niagara, New York, had been issued by a Newfane Town Court judge on July 24, 2007 based upon the Warrant Application and affidavits of Investigator Scott Barnes and Detective Kevin Newman of the NCSO sworn to July 24, 2007.  (Government Exhibits 2 and 1, respectively).[2]  The search warrant also authorized a search of the person of Anthony David Barone as well as a search of a 2004 Chevrolet Aveo.  (Government Exhibit 2) (T1 p. 27).


At approximately 11:00 a.m. on July 27, 2007, the team of the NCSO drug task force arrived at the premises of 5976 Elmwood Lane, Newfane, New York for the purpose of executing the search warrant authorizing the search of the premises as well as that of the person of Anthony David Barone and the 2004 Chevorlet Aveo.  At this time, neither Investigator Barnes nor any other members of the NCSO drug task force

---

[1] The facts are taken from the transcript of testimony given March 11, 2009 designated (T1) and April 2, 2009 (T2) followed by the appropriate page number(s).

[2] Exhibit references are to exhibits received in evidence at the suppression hearing conducted by this Court on March 11 and April 2, 2009.

had any information about illegal drug activities by the defendant.  (T1 pp. 36).  They entered the premises through an unlocked door and determined that no one was present in the residence.  (T1 p. 31).

A search of the premises resulted in the discovery of controlled substances which were seized and determined to be cocaine based on field tests conducted at that time.  (T1 pp. 32-33).  Investigator Evans had been assisting Detective Newman and Investigator Barnes in this investigation and was aware of the alleged involvement of Barone.  (T1 p. 45).  He was also familiar with Barone. (T1 p. 44).

Shortly after the finding of the cocaine, Investigator Evans exited the premises, and while standing outside, observed "a black 1996 Lexus being operated by the defendant" and Anthony David Barone sitting in the front passenger seat of the vehicle (T1 pp. 39-40) as the vehicle "was coming towards [him] traveling eastward inside the mobile home park on the same road that [he] was on."  He "saw Mr. Barone looking in his direction, looking past [him] towards the other [NCSO marked] vehicles that were there."  The Lexus did not stop but kept going past the Barone residence. (T1 p. 41).  The trailer park in which Barone's trailer was located is serviced by a circular road.  (T1 p. 4).

Investigator Evans directed Deputy Eodice of the NCSO "to go perform a traffic stop" on "a black Lexus" which had just driven by Barone's residence with Barone

in it.  (T1 p. 5).  Deputy Eodice drove his marked police vehicle in an opposite direction to that traveled by the Lexus in the trailer park, and when he saw "the black Lexus coming towards [him], [he] put [his] overhead lights on to stop the vehicle.  (T1 p. 6). This vehicle stopped and only contained one individual, the driver, later identified as the defendant herein.  (T1 p. 6).  Investigator Evans asked the defendant "where's your front seat passenger," meaning Barone, but "there was no verbal response, . . . just a shrug of the shoulders."  (T1 p. 43).  Evans directed Deputy Eodice to stay with the defendant and obtain pedigree information from him while Evans went looking for Barone.  (T1 p. 43).

Investigator Evans observed Barone as "he was walking away from the roadway in a northwesterly direction."  He approached Barone and "called him back" and conducted a "pat down" of Barone for the purpose of "finding narcotics on his person" but none were found.  (T1 pp. 44-45).  Nevertheless, Inspector Evans took Barone into custody at that time and transported him back to his residence.  (T1 pp. 45-46).  While escorting Barone to his residence, Inspector Evans "look[ed] for any drugs that may have been tossed in the area" but he did not find any.  (T1 p. 46).  Thereafter, Investigator Evans returned to the defendant's vehicle.  (T1 p. 46).

"Approximately 20 to 30 seconds after [Eodice] performed the stop on the vehicle," Deputy Edward Briggs and Investigator Dan Douglas arrived on the scene.  Up to this point in time, Deputy Eodice had not observed any violations of the New York Vehicle and Traffic Law ("NYV&T") by this black Lexus.  (T1 p. 12).  The defendant

-4-

produced his driver's license and vehicle registration when requested to do so by Deputy Eodice, and these checked out as being valid. (T1 p. 13).

Deputy Eodice advised Investigator Douglas that he had "observed a baseball bat in the back seat [of the Lexus]. (T1 p. 15). However, Deputy Eodice did not deem it necessary to remove the defendant from the vehicle in order to protect himself. (T1 p. 21). Deputy Eodice was not going to release the defendant "until [he] was instructed to [do so] by Investigator Evans, who was continuing the investigation." (T1 p. 22). At this point, Investigator Douglas, Deputy Briggs and two other drug task force agents began to question the defendant. (T1 pp. 22-23).

Deputy Briggs asked the defendant to step out of his vehicle in order "to remove him away from the weapon [the baseball bat] and the defendant complied. (T1 pp. 117, 146; T2 p. 24). After directing the defendant to place his hands on the top of the vehicle, Deputy Briggs conducted a "pat down search" of the defendant "to see if he had any weapons on him." None were found, but the deputy noticed "a bulge in [the defendant's] front pocket and asked him what it was and he said it was money." Deputy Briggs asked the defendant "if [he] could pull it out to make sure it was money and [the defendant] said sure." Deputy Briggs "put [his] hand in [the defendant's] pocket and confirmed that it was a wad of cash" which he "put right back in [the defendant's] pocket." (T1 pp. 117-118).

Deputy Briggs and Inspector Douglas testified that the presence of the baseball bat in the back seat of the defendant's vehicle caused them to believe that it was being used by the defendant as an instrument for protection and safekeeping of drugs and cash. (T1 p.119). The presence of a large amount of cash on the person of the defendant also caused him to believe that the defendant may have just been involved in a drug deal. (T1 p. 119; T2 pp. 25-27).

Deputy Briggs asked the defendant if he could "look into the car" and the defendant said "no." (T1 p. 120). The defendant appeared "very nervous;" never really made eye contact with [them] the whole time [they] were talking to him" and this "raised" Deputy Brigg's "suspicion" that "there were narcotics in the vehicle." (T1 p. 120). The defendant never gave permission to search his car. (T1 p. 121). Because of the way the defendant was acting, the officers decided to call for a canine "to sniff the car to see if the dog could make a hit on the car." (T1 p. 122).

Investigator Evans advised the defendant as to who they were and the reason for being at Barone's residence. He also told the defendant that he had observed Barone in the defendant's vehicle and for that reason, they wished to search the defendant's automobile on the assumption that Barone "may have tossed, dumped, dropped some dope in [the defendant's] vehicle." (T1 pp. 47-48). He asked the defendant for permission to search his vehicle but the defendant refused stating, "Ain't no one - ain't nobody's (sic) gonna search my vehicle." (T1 p. 48). Investigator Evans had prior knowledge about the defendant since he had been the "subject of a narcotics

investigation" by fellow officers in his office and it was believed that the defendant was a "drug dealer." (T1 pp. 48-49, 63).

When the defendant refused to give his consent to the search of his vehicle, Investigator Evans advised him that if he (the defendant) "failed to cooperate, the next step would be to contact the Niagara County Canine Unit and enlist his (sic) assistance." (T1 p. 51). Investigator Evans once again sought the consent of the defendant to search his vehicle but the defendant refused. (T1 p. 52). Thereupon, Investigator Evans contacted the K9 unit at 11:52 a.m. on July 27, 2007, and Deputy Hildreth arrived at the scene with his dog at 12:11 p.m. on that date. (T1 p. 54) (*See* Government Exhibit 13). Meanwhile, the defendant had been "placed in the back of a patrol car." (T2 p. 40).

Approximately forty-five (45) minutes had elapsed between the initial stop of the defendant's vehicle and the arrival of Deputy Hildreth with his dog. (T1 p. 131). Deputy Hildreth "ran the dog around the outside of the [defendant's] vehicle" and "the dog hit on the trunk area of the car." (T1 p. 124). As a result, Deputy Hildreth and Investigator Douglas "went to obtain a search warrant for the [defendant's] vehicle." (T1 pp. 124-125).

It took approximately twenty-five (25) to thirty (30) minutes to prepare the application for the search warrant and present it to the Town of Newfane Justice. (T2 p. 36). Another fifteen (15) to twenty (20) minutes were expended by the Town Justice in

reviewing the warrant application and issuing a search warrant authorizing the search of the defendant's automobile. (T2 pp. 36-37). An additional five (5) to ten (10) minutes was expended in returning to the defendant's vehicle with the search warrant. (T2 p. 37). A total of approximately one hour and thirty (30) minutes minimum, or one hour and forty-five (45) minutes maximum, elapsed between the initial stop of the defendant's vehicle and the return of the officers with the search warrant authorizing the search of his vehicle.

A search of the defendant's vehicle was then conducted, and "controlled substances" were found in the vehicle. As a result, the defendant was placed under arrest. (T2 p. 37).

## DISCUSSION AND ANALYSIS

The defendant argues that "the officers violated [his] Fourth Amendment rights by continuing to detain him even after they determined that Anthony Barone was not in [his] car" and therefore, the evidence seized during the unlawful search of [his] person and vehicle must be suppressed." (Docket #25, p. 7). In support of this position, the defendant asserts that the officers "had no facts, evidence, or circumstances - beyond mere speculation - that Howard had controlled substances on his person [or] in his vehicle." (Docket #25, p. 9). As a result, he claims that "reasonable suspicion" was lacking and therefore, the stop of the vehicle and the continued detention of the defendant could not be justified as a valid *Terry* stop. (Docket #25, pp. 9-10).

It is undisputed that on July 27, 2007 the officers had a search warrant authorizing not only the search of the residence of Anthony Barone but also one authorizing the search of his person which had been issued by the Town of Newfane judge.  The existence of the search warrant, for purposes of the issues herein, established that probable cause had been found by the issuing judge that Anthony Barone was engaged in criminal activity, to wit, illegal drug activity.  This finding was further established by the finding of cocaine in Barone's residence pursuant to that search warrant.  It was only a matter of minutes after the cocaine had been discovered in Barone's residence when Investigator Evans observed Barone as a front seat passenger in an automobile being driven by the defendant.  (T1 pp. 39-40).

Because the officers had a search warrant authorizing the search of Barone's person and because Barone had just been observed by Investigator Evans in the automobile being driven by the defendant, and because the officers had just discovered and seized cocaine in Barone's residence, they certainly had reasonable suspicion to believe that "criminal activity was afoot" so as to justify a *Terry*[3] stop of the vehicle in which Barone was a passenger.

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *Terry v. Ohio*, 392 US 1, 9, 20 L Ed 2d 889, 88 S Ct 1868 (1968); *United States v. Cortez*,

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

449 US 411, 417, 66 L Ed 2d 621, 101 S Ct 690 (1981). Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni-Ponce*, 422 US 873, 878, 45 L Ed 2d 607, 95 S Ct 2574 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "'may be afoot,'" *United States v. Sokolow*, 490 US 1, 7, 104 L Ed 2d 1, 109 S Ct 1581 (1989) (quoting *Terry, supra*, at 30, 20 L Ed 2d 889, 88 S Ct 1868). See also *Cortez*, 449 U.S., at 417, 66 L Ed 2d 621, 101 S Ct 690 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. See, *e.g., id.,* at 417-418, 66 L Ed 2d 621, 101 S Ct 690. This process allows officers to draw on their own experience and specialized training to make inferences from the deductions about the cumulative information available to them that "might well elude an untrained person." *Id*., at 418, 66 L Ed 2d 621, 101 S Ct 690. See also *Ornelas v. United States*, 517 US 690, 699, 134 L Ed 2d 911, 116 S Ct 1657 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, *Terry, supra*, at 27, 20 L Ed 2d 889, 88 S Ct 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow, supra*, at 7, 104 L Ed 2d 1, 109 S Ct 1581.

Our cases have recognized that the concept of reasonable suspicion is somewhat abstract. *Ornelas, supra*, at 696, 134 L Ed 2d 911, 116 S Ct 1657 (principle of reasonable suspicion is not a "finely-tuned standar[d]'"); *Cortez, supra*, at 417, 66 L Ed 2d 621, 101 S Ct 690 (the cause "sufficient to authorize police to stop a person" is an "elusive concept"). But we have deliberately avoided reducing it to "'a neat set

of legal rules,'" *Ornelas, supra*, at 695-696, 134 L Ed 2d 911, 116 S Ct 1657 (quoting *Illinois v. Gates*, 462 US 213, 232, 76 L Ed 2d 527, 103 S Ct 2317 (1983)). In *Sokolow*, for example, we rejected a holding by the Court of Appeals that distinguished between evidence of ongoing criminal behavior and probabilistic evidence because it "create[d] unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment." 490 US, at 7-8, 104 L Ed 2d 1, 109 S Ct 1581.

*United States v. Arvizu, 534 U.S. 266, 273-274 (2002)*

Since Barone had just been observed as a passenger in the defendant's vehicle after the discovery of the contraband in Barone's residence, the officers had sufficient reasonable suspicion that the occupants of the vehicle were involved in criminal activity. As the Supreme Court has held:

> In particular, the Court has noted that law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity.
>
> *   *   *
>
> Although stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from intrusion.

*United States* v. *Hensley*, 469 U.S. 221, 226 (1985); *see also Brendlin v. California,* 551 U.S. 249, 257, fn. 3 (2007) (police may stop a car solely to investigate a passenger's conduct); *United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009).

The defendant argues that once it became obvious to the officers that Barone was not present in the defendant's vehicle, they no longer had a right to detain the defendant as part of a *Terry* stop. (Docket #25, p. 8). The Court rejects this premise for the following reasons.

It was only moments before the stop that Barone had been observed in the defendant's vehicle as that vehicle passed in front of Barone's residence. Barone, and presumably the defendant, had observed the marked patrol cars outside his residence since Investigator Evans had observed him looking at those vehicles. (T1 pp. 39-41). When the vehicle was stopped a few moments after that observation, Barone was nowhere to be seen. This circumstance was certainly sufficient to arouse the suspicions of Investigator Evans that "criminal activity was afoot" and the belief that the driver of the vehicle had information as to the whereabouts of Barone.

The fact that the officers asked the defendant to exit from his vehicle and place his hands on top of the vehicle while Deputy Briggs conducted a "pat down search" of the defendant" to see if he had any weapons on him did not cause the detention of the defendant to be a violation of his Fourth Amendment rights. This request to vacate the vehicle was made in order "to remove [the defendant] away from (sic) the weapon [the baseball bat]" which had been observed on the back seat of the defendant's vehicle. (T1 pp. 15, 117, 146; T2 p. 24). *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977); *Maryland* v. *Wilson*, 579 U.S. 408, 415 (1997); *Molica* v. *Volker*, 229 F.3d 366, 369 (2d Cir. 2000). *See Dempsey v. Town of Brighton,* 749 F. Supp. 1215

(W.D.N.Y. 1990) (officer's decision to stop vehicle containing individual who matched description of suspect in armed bank robbery and order occupants of the vehicle to crawl out of the vehicle and lay down on the grass, and to handcuff their wrists behind their back while conducting a pat down search, was reasonable), *aff'd* 940 F.2d 648 (2d Cir.) (unpublished table decision), *cert. denied*, 502 U.S. 925 (1991); *see also United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) ("The amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight or drawing guns where law officers reasonably believe they are necessary for their protection."), *cert. denied* 494 U.S. 1008 and 494 U.S. 1069 (1990); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) ("requiring the suspect to lie down while a frisk is performed, if reasonably necessary, does not transform a Terry stop into an arrest.").

When Deputy Briggs noticed "a bulge in [the defendant's] front pocket" he had a right, for officer safety purposes, to ask him what it was.

> In *New York v. Quarles*, the Supreme Court identified a "narrow exception to the Miranda rule," when arresting officers ask a defendant "questions necessary to secure their own safety or the safety of the public." 467 U.S. at 658-59, 104 S.Ct. 2626. Recently reiterating this principle in *United States v. Reyes*, this court observed that "Miranda warnings need not precede 'questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers" for a suspect's answers to be admitted as evidence of his guilt. 353 F.3d at 152 (quoting *New York v. Quarles*, 467 U.S. at 656, 104 S.Ct. 2626). The public safety exception to Miranda does not depend upon the subjective motivation of the questioning officer. *See Quarles*, 467 U.S. at 655-56, 104 S.Ct. 2626. Rather, it

applies so long as the questioning "relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger." *Id*. at 659 n. 8, 104 S.Ct. 2626; accord *United States v. Reyes*, 353 F.3d at 154.

*United States v. Newton*, 369 F.3d 659, 677-78 (2d Cir. 2004).

In *United States v. Reyes*, 353 F.3d 148 (2d Cir. 2003), the court

expressed the basis for the exception to the *Miranda* rule wherein it stated:

We emphasize, as did the Supreme Court, that the purpose of the public safety exception is to allow officers "to follow their legitimate instincts when confronting situations presenting a danger to the public safety." *Quarles*, 467 U.S. at 659, 104 S.Ct. 2626. There has to be some flexibility in situations where the safety of the public and the officers are at risk.

*Id*. at 155; *See also United States v. Shea*, 150 F.3d 44, 48 (1st Cir. 1998); *United States v. Talley*, 275 F.3d 560, 563-65 (6th Cir. 2001).

The defendant voluntarily advised the deputy that the "bulge" was

"money," and when the deputy asked the defendant for permission to "pull it out to

make sure it was money," the defendant consented to his doing so. The deputy

removed the money from the defendant's pocket which he described as being a "wad of

cash" which the defendant said amounted to $1,500. (T1 pp. 117-118).

Both Deputy Briggs and Investigator Douglas testified that the presence of

the baseball bat in the back seat of the defendant's vehicle along with the presence of a

large amount of cash on the person of the defendant caused them to believe that the

defendant may have just been involved in a drug deal. (T1 p. 119; T2 pp. 25-27).

These facts, along with the facts that drugs had just been found in Barone's residence, and that Barone had only a few moments before been a passenger in the defendant's vehicle, and defendant's non-response to Investigator Evans' question to him as to the whereabouts of Barone, certainly were sufficient to create a reasonable suspicion that the defendant may be engaged in criminal activity with Barone thereby justifying his detention for purposes of conducting their investigation.  As the Supreme Court stated in *Adams v. Williams*, 407 U.S. 143 (1972):

> In Terry this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  Id., at 22, 20 L Ed 2d at 906.  The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.  See id., at 23, 20 L Ed 2d at 907.  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.  Id., at 21-22, 20 L Ed 2d at 905, 906; see Gaines v. Craven, 448 F2d 1236 (CA9 1971); United States v. Unverzagt, 424 F2d 396 (CA8 1970).

The fact that the officers detained the defendant for a period of time after learning that Barone was not present in the vehicle is of no legal consequence. Admittedly, "[i]f an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be

based on probable cause."  *United States v. Babwah*, 972 F2d 30, 33 (2d Cir. 1992).

However, "[a]n investigatory stop continues as such if it remains 'reasonably related in

scope to the circumstances which justified the interference in the first place'."  Citations

omitted).  *Id.*

        The totality of the circumstances in this case justified the continued

detention of the defendant as part of a *Terry* stop investigation.  It is also pointed out

that, as Investigator Evans testified, the defendant was known to the officers since he

had been the "subject of a narcotics investigation" and that the defendant was believed

to be a "drug dealer" by fellow officers in Evans' office.  (T1 pp. 48-49, 63).

        Since Barone had vacated the vehicle, and because Investigator Evans

did not find any drugs on Barone after searching him (T1 pp. 44-45), he believed that

Barone "may have tossed, dumped, dropped some dope in [the defendant's] vehicle."

(T1 pp. 47-48).  Because of this, permission was sought from the defendant to search

his vehicle, which request was refused.  (T1 pp. 48, 52, 120).  Deputy Briggs testified

that the defendant appeared "very nervous" and his demeanor "raised suspicion [that]

there were narcotics in the vehicle."  (T1 p. 120). This nervous and evasive behavior of

the defendant is relevant to a reasonable suspicion determination. Illinois v. Wardlow,

528 U.S. 119, 124 (2000); United States v. Herring, 2010 WL 1731817 (2d. Cir. 2010

Summary Order).  As a result, it was decided to call for a canine "to sniff the car to see

if the dog could make a hit on the car,"  (T1 p. 122) and Deputy Hildreth was called to

the scene along with his canine.  (T1 p. 54).

Approximately forty-five (45) minutes had elapsed between the initial stop of the defendant's vehicle and the arrival of Deputy Hildreth.  (T1 p. 131).  This forty-five (45) minute detention period did not cause this *Terry* stop to be transformed into a *de facto* arrest.  As the United States Supreme Court instructed in *United States v. Sharpe*, 470 U.S. 675 (1985):

> Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.  But our cases impose no rigid time limitation on Terry stops.  While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on suspicion," United States v. Place, supra, at 709, 77 L Ed 2d 110, 103 S Ct 2637, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.  United States v. Hensley, 469 US, at 228-229, 234-235, 83 L Ed 2d 605, 105 S Ct 675; Place, supra, at 703-704, 709, 77 L Ed 2d 110, 103 S Ct 2637; Michigan v. Summers, 452 US 692, 700, and n 12, 69 L Ed 2d 340, 101 S Ct 2587 (1981) (quoting 3 W. LaFave, Search and Seizure § 9.2, pp 36-37 (1978)).  Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.  We sought to make this clear in Michigan v. Summers, supra:
>
> "If the purpose underlying a Terry stop – investigating possible criminal activity – is to be served, the police must under circumstances be able to detain the individual for longer than the brief time period involved in Terry and Adams [v Williams, 407 US 143 [32 L Ed 2d 612, 92 S Ct 1921] (1972)]."  452 US, at 700, n 12, 69 L Ed 2d 340, 101 S Ct 2587.
>
> Later, in Place, we expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible Terry stop:
>
> "We understand the desirability of providing law enforcement

authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." 462 US, at 709, n 10, 77 L Ed 2d 110, 103 S Ct 2637.

*   *   *

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. See Michigan v. Summers, supra, at 701, n 14, 69 L Ed 2d 340, 101 S Ct 2587 (quoting 3 W. LaFave, Search and Seizure § 9.2, p 40 (1978)); see also Place, 462 US, at 709, 77 L Ed 2d 110, 103 S Ct 2637; Royer, 460 US, at 500, 75 L Ed 2d 229, 103 s Ct 1319. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. See generally post, at 712-716, 84 L Ed 2d, at 632-635 (Brennan, J., dissenting). A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." Cady v. Dombrowski, 413 US 433, 447, 37 L Ed 2d 706, 93 S Ct 2523 (1973); see also United States v. Martinez-Fuerte, 428 US 543, 557, n 12, 49 L Ed 2d 1116, 96 S Ct 3074 (1976). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

Id. At 685-687.

The officers were concerned with the issue of whether the defendant's automobile contained contraband. Since an automobile is inherently mobile, it is legally

deemed to have "ready mobility." *See United States v. Howard*, 489 F.3d 484, 494 (2d Cir. 2007). Therefore, it was reasonable for the officers to detain the defendant and his vehicle as a continuation of the *Terry* stop until the "dog sniff" of the vehicle could be carried out. The officers called for Deputy Hildreth and the dog at 11:52 a.m. on July 27, 2007, and Deputy Hildreth arrived on the scene with his dog at 12:11 p.m. on that date. (T1 p. 54; Government Exhibit 13). This period of 19 minutes did not constitute an unreasonable delay or demonstrate a failure on the part of the officers to act diligently in carrying out their *Terry* stop investigation. The defendant certainly has not presented any evidence to establish that the officers were dilatory in their investigation. The call for the canine for the purpose of conducting a "dog sniff" of the defendant's vehicle to determine whether it contained drugs constituted a reasonable "means of investigation that was likely to confirm or dispute their suspicions quickly." *Id.* At 686. The conducting of the "dog sniff" of the defendant's vehicle's exterior did not constitute a violation of defendant's Fourth Amendment rights. *See Illinois v. Caballes*, 543 U.S. 405, 409; *United States v. Place*, 462 U.S. 696, 707 (1983). Once Deputy Hildreth arrived at the scene with his dog, he immediately "ran the dog around the outside of the [defendant's] vehicle" and "the dog hit on the trunk area of the car" indicating the presence of contraband in the vehicle. (T1 p. 124). The detention of the defendant and his vehicle for approximately forty-five (45) minutes for the purpose of conducting a brief questioning of the defendant and to await the arrival of the canine was a "limited intrusion on [the defendant's] Fourth Amendment interests wholly justified by reasonable suspicion." *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992).

This action by the dog was sufficient to establish probable cause for the search of the defendant's vehicle. *Glover, supra.* It is pointed out that at this point in time, there was sufficient probable cause by reason of the dog hit on the vehicle to believe that the vehicle contained contraband thereby justifying a search of the automobile without a warrant. The Fourth Amendment does not require the police to obtain a search warrant to search an automobile when they have probable cause to believe that it contains contraband or evidence of criminal activity. *Arizona v. Gant*, __ U.S. __ , 173 L.Ed.2d 485, 498 (2009); *United States v. Ross*, 456 U.S. 798, 809 (1982); *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *United States v. Johns*, 469 U.S. 478, 483-484 (1985); *Chambers v. Maroney*, 399 U.S. 42, 46-47 (1970); *Carroll v. United States*, 267 U.S. 132, 160-162 (1925). As stated earlier, the vehicle in question was deemed to be "readily mobile" by reason of its "inherent mobility." *United States v. Howard, supra* at 494. As a result, the Fourth Amendment permits a search of the vehicle without more. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *United States v. Navas*, ___ F.3d __ (2d Cir. March 8, 2010). Nevertheless, the officers chose a more conservative route by obtaining a search warrant authorizing the search of the defendant's vehicle. This resulted in an additional delay of approximately 50 to 60 minutes while the officers prepared the application for the search warrant and presented it to the town justice for his review and the issuance of the search warrant as well as travel time to and from the judge's chambers. (T2 pp. 36-37). Such delay was of a minor duration especially considering that the officers could have searched the vehicle without a warrant after the canine had made the positive hit.

A search of the defendant's vehicle pursuant to the search warrant resulted in the seizure of the contraband which defendant seeks to have suppressed as evidence.

When considering the totality of the circumstances herein, I find that the officers were faced with "a swiftly developing situation" and their actions in stopping the defendant's vehicle and detaining the defendant were reasonable in order for them to conduct an investigation as to the whereabouts of Barone as well as the role of the defendant in their overall drug investigation of Barone. "Given the officers' diligence in pursuing their investigation, and given the government's substantial interest in drug interdiction, *see e.g., Place*, 462 U.S. at 703, detaining [the defendant] for approximately forty-five (45) minutes to conduct brief questioning and to await the arrival of the narcotics dog was a limited intrusion on [his] Fourth Amendment interests wholly justified by reasonable suspicion." *Glover, supra*. Therefore, it is RECOMMENDED that defendant's motion to suppress evidence be DENIED in all respects. It is hereby

**ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of**

**Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**

**s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:**     **Buffalo, New York**
              **May 10, 2010**